IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

SCHILLING ENTERPRISES, L.L.C.                                             PLAINTIFF

vs.                                                                  No. 4:04CV343-D-D

SUPERIOR BOAT WORKS, INC.; et al.                                       DEFENDANTS

FEDERAL INSURANCE COMPANY                                               INTERVENOR

OPINION

     Schilling Enterprises, L.L.C. instituted this admiralty action for damage sustained to Schilling's casino barge SPLASH. The SPLASH barge capsized at the Defendant Superior Boat Works, Inc.'s Lake Ferguson, Mississippi, shipyard on September 11, 2004, after making contact with a sunken barge on September 9, 2004. Superior has admitted responsibility for the initial holing of the SPLASH, but denies responsibility for its subsequent capsizing. In addition, Federal Insurance Company has intervened in this action, seeking a declaratory judgment in its favor that Superior's two insurance policies with Federal do not provide indemnity coverage for any potential damages in this case.

     The court has jurisdiction of this cause pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. A bench trial in this matter was convened from May 8, 2006, through May 11, 2006.

     Having carefully considered the testimony and exhibits presented at trial along with the parties' post-trial submissions, the court finds as follows on the three major issues presented in this case: (1) the Defendant, Superior Boat Works, is 75 percent at fault for the damages sustained by the SPLASH casino barge; the Plaintiff, Schilling Enterprises, is 25 percent at fault for the damages

sustained by the SPLASH casino barge; (2) the value of the SPLASH casino barge prior to its capsizing was $900,000; and (3) there is insurance coverage for this occurrence under Federal Insurance Company policy number 7319777.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court issues the following findings of fact and conclusions of law.

*A. Factual Background*

The Defendant Superior Boat Works operates a shipyard on Lake Ferguson in Greenville, Mississippi. Superior also owns the tugboat M/V CAPT. STOVALL and owns a sunken barge, named the B6, which sank in Lake Ferguson in 1994 and which remains submerged in the lake. The Plaintiff Schilling owns the SPLASH casino barge, which capsized in Lake Ferguson on September 11, 2004, after making contact with the sunken B6 barge on September 9, 2004.

The SPLASH casino barge was towed to Superior's Lake Ferguson facility in June of 2004. Schilling contracted with Superior to provide moorage space for the SPLASH barge for $3,000 per month while the SPLASH was being repaired and refurbished so as to return to service as a casino; this service was to include Superior moving the SPLASH barge as Lake Ferguson's water levels changed and to keep the SPLASH aligned with a loading ramp over which personnel and materials were loaded onto the SPLASH. Schilling and Superior also both state that Superior agreed to perform repairs to the SPLASH barge, including exterior metal fabrication, during this time.

As the Mississippi River and Lake Ferguson rise and fall, moored vessels in Lake Ferguson, such as the SPLASH casino barge, must be moved back and forth with the water level. Superior uses the tugboat M/V CAPT. STOVALL tugboat for this purpose, and in fact did reposition the SPLASH on seven occasions (July 13, 22, and 30; August 14, 20, and 29; and September 6, 2004).

Around 8:30 a.m. on September 9, 2004, the CAPT. STOVALL, which was being piloted by Matt Barham, began what would be the final repositioning of the SPLASH casino barge. As the CAPT. STOVALL attempted to move the SPLASH out from the Lake's bank, the SPLASH contacted and was dragged over the submerged barge B6, holing the SPLASH and causing it to take on water. After four hours of attempting to move the SPLASH barge off of the B6 barge, Barham decided to move the CAPT. STOVALL away from the SPLASH barge. At this time, the SPLASH barge had begun listing to its port (left) side as it was taking on water. The SPLASH then capsized at 5:15 a.m. on September 11, 2004, less than two days after the initial allision[1] took place.

This litigation followed, with Schilling filing its complaint on November 12, 2004, and asserting a claim against Superior for damages incurred by the loss of the SPLASH casino barge. Thereafter, on September 9, 2005, Federal Insurance Company intervened in this action, seeking a declaratory judgment in its favor that Superior's insurance policies with Federal do not provide indemnity coverage for any damages in this case.

*B. Discussion*

1. Apportionment of Fault for the Sinking of the SPLASH Casino Barge

Negligent conduct on navigable waters that causes loss to another constitutes a maritime tort. United States v. M/V BIG SAM, 681 F.2d 432, 443 (5th Cir. 1982). It is axiomatic that liability for the damage sustained in maritime collision and allision cases is to be allocated according to the degree of the parties' respective comparative fault. United States v. Reliable Transfer Co., 421 U.S.

---

[1] An allision is "the sudden impact of a vessel with a stationary object such as an anchored vessel or a pier." Black's Law Dictionary, 7th Ed. at 75. This is an allision case, as opposed to being a collision case, because the object that the SPLASH barge struck was not another seagoing vessel, but rather was the sunken B6 barge, a stationary object.

397, 410-11, 95 S.Ct. 1708, 1715-16, 44 L. Ed. 2d 251 (1975); Valley Towing Serv., Inc. v. S/S AMERICAN WHEAT, 618 F.2d 341, 346 (5th Cir. 1980).

As a corollary to the comparative fault principle, if a party to a maritime accident has violated a federal statute, a rule of law known as the Pennsylvania rule is invoked. The Pennsylvania rule provides that when a ship violates a federal statutory rule of admiralty, "the burden rests on the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L. Ed. 148 (1873); see Transorient Navigators Co., S.A. v. M/S SOUTHWIND, 714 F.2d 1358, 1369 (5th Cir. 1983). If the subject party carries this burden, the burden of proof as to causation is then shifted to its opponent. The Pennsylvania rule applies in allision cases where a party responsible for properly marking a stationary object in navigable waters, including an underwater obstruction, fails to do so. Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1472 (5th Cir. 1991).

As the Fifth Circuit has noted, however, the Pennsylvania rule simply determines which party bears the burden of proof regarding fault, transferring it to the party that is in violation of a statute or regulation. Pennzoil, 943 F.2d at 1472. The rule does not determine a party's ultimate share of liability for a loss; thus the principle of comparative negligence remains intact and is applied by courts in maritime allision cases. See id (holding that if "a party fails to carry the burden imposed on it by the rule, the rule does not require that party to bear 100% of the responsibility for the allision."). As such, the court shall examine the events surrounding the capsizing of the SPLASH casino barge and allocate fault between the Plaintiff and Defendant accordingly.

When a moving vessel strikes a fixed object, the moving vessel is presumed to be at fault. Delta Transload, Inc. v. M/V Navios Commander, 818 F.2d 445, 449 (5th Cir. 1987). When a

mariner knows of an obstruction to navigation he is under a duty to avoid it. Pennzoil, 943 F.2d at 1470-71. This presumption applies to allisions with submerged or hidden objects when the person operating the vessel has actual knowledge of the obstruction, as was the case here. Id. In addition, the operator of a fleeting facility has a duty to exercise reasonable care and maritime skill in the care of barges entrusted to it. Noonan Constr. Co. v. Federal Barge Lines, Inc., 453 F.2d 637, 641 (5th Cir. 1972).

The court finds that the Defendant Superior, in addition to its admitted negligence in causing the SPLASH casino barge to contact the B6 barge, was also negligent in failing to properly mark the B6 barge as was required by the federal Wreck Act, 33 U.S.C. § 409, which is part of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq*.[2] It is undisputed that the B6 barge, which was a wreck and was sitting largely submerged in Lake Ferguson, is covered by the Wreck Act.

Thus, under the Wreck Act, the Defendant Superior had a statutory duty to mark the B6 barge, begin removal of the B6 from Lake Ferguson, and to maintain the proper markings until the B6 was entirely removed from the lake. See 33 U.S.C. § 409. Because Superior elected not to remove the B6 barge, aside from the fact that it did not properly mark it, it was obligated to obtain a permit for it from the Corps of Engineers pursuant to 33 C.F.R. § 322.3. Superior failed to do so. Thus, the court finds that Superior was negligent in its Wreck Act duties and that the burden of proof as to negligence in this case is shifted to Superior in accordance with the Pennsylvania rule, as noted

---

[2] The Wreck Act provides, in pertinent part, that a vessel owner is required to mark and maintain its wrecked vessel and remove it from the area where it capsized. In re Transporter Marine, Inc., 217 F.3d 335, 338 (5th Cir. 2000). The failure to properly mark a wreck or to maintain a proper mark on the wreck subjects the wreck's owner to potential liability to third parties harmed thereby. In re Barnacle Marine Management, Inc., 233 F.3d 865, 868 (5th Cir. 2000); Morania Barge No. 140, Inc. v. M & J Tracy, Inc., 312 F.2d 78 (2nd Cir. 1962).

above, because Superior violated a federal statute - the Wreck Act.

Because Superior stipulates that it is wholly responsible for the initial allision between the SPLASH barge and the B6 barge and the fact that the SPLASH was holed thereby, the court finds that Superior is 75% at fault for the capsizing of the SPLASH barge. Had the SPLASH not been pushed into and dragged over the B6 barge, post-accident actions would not have been necessary and the Plaintiff's actions would not need to be analyzed. Superior's actions began the chain of events that led to the SPLASH's capsizing on September 11, 2004. Accordingly, the court finds that the vast majority of fault lies with Superior because it caused the initial event that led to the capsizing. Superior does not dispute that it is wholly responsible for the allision itself, but it insists that Schilling's post-accident actions also contributed to the capsizing of the SPLASH casino barge. Because the burden of showing negligence on the part of Schilling lies with Superior (pursuant to the <u>Pennsylvania</u> rule), the court now will examine the actions of the Plaintiff Schilling in the aftermath of the SPLASH-B6 allision.

After the SPLASH and the B6 made contact (an event that occurred at approximately 8:30 a.m. on September 9, 2004), the Plaintiff's employees boarded the SPLASH barge and noticed that it was taking on water in one of its compartments, the Number 4.[3] The Plaintiff then rented pumps and put them into use on the SPLASH barge in order to attempt to pump water out of the flooded area of the SPLASH. The Plaintiff avers that it was not aware, and was not told, what object the SPLASH had an allision with, and thus what steps it could take that would be most beneficial in

---

[3]Barges are designed with watertight compartments that are separated from each other by bulkheads (a bulkhead is an upright wall within the hull of a ship used to create watertight compartments that can contain water in the case of a hull breach or other leak) in order to prevent capsizing. If one compartment is breached and fills with water, the neighboring compartments should remain dry and the vessel afloat.

order to attempt to save the SPLASH barge.

After the allision, only the No. 4 compartment of the SPLASH barge was initially taking on water.[4] Schilling employee Dan Malone, the senior ranking Schilling employee on the scene, decided to breach the bulkhead between the No. 4 and No. 5 compartments in order to pump the water that had entered the No. 4 compartment out through the No. 5 compartment, as the No. 4 compartment was completely flooded. He did this despite the fact that the No.4 compartment was watertight and would not leak unless the surrounding bulkhead was breached. Despite these efforts to pump the water out from the No. 4 (and now the No. 5 as well) through the No. 5 compartment, the Plaintiff's crew was not able to pump any more water out of the SPLASH barge than was coming into the barge via the holes in the No. 4 compartment caused by its allision with the B6 barge. In fact, the SPLASH was slowly sinking, due in part to the Plaintiff's decision to breach the bulkhead between the No. 4 and No. 5 compartments and permit water to escape from the watertight No. 4 compartment. The SPLASH barge was designed to remain afloat with one of its void compartments full of water, but not with two or more. Ultimately, nearly two days after the initial allision, the SPLASH sank. In light of these facts, the court holds that the Defendant Superior has proven that the Plaintiff's actions contributed to the capsizing of the SPLASH casino barge.

Thus, the court finds that Schilling's decision to breach the bulkhead between the No. 4 and No. 5 compartments, and to then pump water out from the No. 5 compartment back into Lake Ferguson, was ineffective and simply resulted in water being circulated from Lake Ferguson into the barge and then back into the lake. By breaching that bulkhead, Schilling did what its own marine

---

[4]Early on the morning of September 10, 2004, water was discovered in the SPLASH's No. 2 and No. 3 compartments. That breach was successfully repaired and the water in those compartments was pumped out.

expert, Fred Budwine, called the most negligent act a vessel owner can do when its vessel has a watertight compartment full of water, and that is to "open the door." Accordingly, the court finds that Schilling's negligence in breaching the bulkhead contributed to the SPLASH's sinking, and the court thus finds that Schilling is 25% at fault for the SPLASH's capsizing.

In sum, the court finds that the Defendant Superior is 75 percent at fault for the SPLASH capsizing and that the Plaintiff Schilling is 25 percent at fault.

## 2. The Market Value of the SPLASH Casino Barge

A vessel is deemed to be a constructive total loss when the cost of salvage and repair exceeds the fair market value of the vessel immediately prior to the casualty. Ryan Walsh Stevedoring Co., Inc. v. James Marine Serv., Inc., 792 F.2d 489, 491 (5th Cir. 1986). Here, the parties agree that the SPLASH casino barge is a constructive total loss.

The market value of vessels in cases such as this is generally established by evidence of contemporaneous sales of like vessels. Standard Oil Co. v. Southern Pac. Co., 268 U.S. 146, 155-56, 45 S.Ct. 465, 467, 69 L. Ed. 890 (1925); E.I. DuPont de Nemours & Co., Inc. v. Robin Hood Shifting & Fleeting Serv., Inc., 899 F.2d 377, 379-80 (5th Cir. 1990). Where a vessel has unique qualities to its owner, however, other methods of valuation such as replacement cost and depreciation may be used as well. DuPont, 899 F.2d at 379-80; King Fisher Marine Serv., Inc. v. NP Sunbonnet, 724 F.2d 1181, 1185-86 (5th Cir. 1984). When a vessel is deemed a constructive total loss, there is no recovery for lost future profits. The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L. Ed. 1053 (1857); Matter of P&E Boat Rentals, Inc., 872 F.2d 642, 648 (5th Cir. 1989). The burden is on the vessel's owner to establish the market value of the vessel.

In the case *sub judice*, it is undisputed that the SPLASH casino barge is a constructive total

loss. The Plaintiff, utilizing the replacement cost approach to valuation, presented evidence at trial that the SPLASH had a fair market value at the time of sinking of $3,032,000. The Defendant likewise presented expert testimony at trial; its expert, utilizing the comparative sale approach, calculated the fair market value of the SPLASH casino barge at $500,000.

The court finds that the SPLASH casino barge is a constructive total loss, as it is undisputed that the cost of salvaging and repairing the vessel exceeds the fair market value it possessed immediately prior to its allision with the B6 barge. Because the Plaintiff's damage appraisal expert, Norman Dufour, admitted during cross-examination that his appraisal underestimated the age of the SPLASH's hull, however, the court finds that his estimate of $3,032,000 is inflated. He testified that the SPLASH's hull had an estimated 30 year total life and that it had 10 years of that 30 remaining. The SPLASH's hull, however, was already 35 years old at the time of the subject allision. Dufour also underestimated the age of the SPLASH's superstructure in his $3,032,000 estimate by eleven years; he assumed it had been built in 1992, when in fact it was built in 1981 and then remodeled in 1992. Upon being presented with these facts, Dufour testified during trial that his opinion as to the SPLASH's value would be materially affected by these facts. He did not, however, provide a new estimate of the SPLASH's market value.

Likewise, the court finds that the Defendant's preferred approach of simply utilizing the comparative sales approach is flawed because the SPLASH casino barge obviously had unique qualities to its owner because it was a casino barge and had undergone extensive renovation for that purpose; thus, other methods of valuation, such as replacement cost, may be used as well. <u>King Fisher Marine</u>, 724 F.2d at 1185-86. The Defendant's expert, William Carrier, discussed five comparable sales of casino vessels, which ranged from zero dollars for a barge that was given away

after no purchasers sought it, to a $600,000 sales price for a barge similar to the SPLASH.

The court finds that the SPLASH casino barge was a special purpose vessel that consisted of two barges that the Plaintiff Schilling purchased from Ashland Oil in 1980 when the barges were around 10 years old. In 1981, Schilling modified the barges into a restaurant and night club. Thereafter, in 1992, Schilling remodeled the barge that would become the SPLASH casino barge at a cost of $800,000. The remodeled SPLASH casino barge weighed nearly 3,000 short tons and was 250 feet in length and 50 feet wide, providing over 17,000 square feet of operating space for commercial casino use. The SPLASH then operated as a casino in Tunica, Mississippi, from 1992 until 1995, when it was moved to Vicksburg, Mississippi. After remaining in Vicksburg for a year and a half, the SPLASH was moved to Port Allen, Louisiana, where it remained moored and out of service until it was towed to Lake Ferguson in June of 2004. It was the first casino barge licensed by the Mississippi gaming commission and was moved to Lake Ferguson in order to be retrofitted and moved to a new location to recommence service as a casino.

Taking into account all of the above-denoted factors, the court finds that the fair market value of the SPLASH casino barge prior to its capsizing was $900,000. While utilizing the comparative sales approach leads to a valuation of $600,000 at most, the court finds that replacement cost should also be considered in valuing the SPLASH barge. While the Plaintiff's estimate of $3,032,000 is undisputedly too high, the court finds that a value of $900,000, fifty percent more than the Defendant's estimate, properly takes into account the cost of the barge, the cost of modification and remodeling, and the SPLASH's unique qualities.

Next, the Plaintiff asserts that the cost of removing the vessel from Lake Ferguson is $425,000 plus an additional $200,000 in associated debris removal; it seeks to have the court award

it damages for these not-yet-incurred expenses. Schilling also claims $32,726.67 in expenses it has actually incurred, including pump rental from Taylor Rental for the pumps used in attempting to save the SPLASH and salvage fees. Because the court has found the Defendant negligent in connection with the SPLASH's capsizing, the court shall award Schilling the expenses that it has actually incurred, reduced by 25 percent due to its own negligence. The remaining damages, however, have not yet been incurred and are speculative. The court thus declines to award those damages. Accordingly, the court holds that Superior is liable to Schilling for 75 percent of the expenses it actually incurred in attempting to save the SPLASH casino barge, or $24,545.

### 3. Insurance Coverage

The Defendant Superior is the named insured on two policies of insurance issued by the Intervenor Federal Insurance Company and in force at the time the SPLASH casino barge capsized: Policy Number 7319777 (the Marine General Liability/Ship Repairer's Legal Liability Policy; hereafter the "primary policy") and Policy Number 7318980 (the Ocean Marine policy, hereafter known as the "excess" or "bumbershoot" policy). The Plaintiff and the Defendant argue that both policies provide Superior coverage, including both indemnity for the claims raised in this case and for Superior's legal expenses incurred in defending this case. The Intervenor disagrees and asserts that neither policy provides the Defendant coverage for any damages incurred in this case.

Federal admiralty law requires courts construing maritime insurance contracts to follow state insurance law principles in cases such as this one. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L. Ed. 337 (1955); Transco Exploration Co. v. Pacific Employers Ins. Co., 869 F.2d 862, 863 (5th Cir. 1989). The Fifth Circuit has ruled that in determining which state's law to apply, courts should look to the state having the greatest interest in the resolution of the issues in

dispute. Transco, 869 F.2d at 863. In the case *sub judice*, it is undisputed that the laws of the State of Mississippi should apply; thus the court shall apply Mississippi law as it pertains to the interpretation of insurance contracts.

In Mississippi, an insurance policy that is plain and unambiguous will be construed exactly as written; however, any ambiguities in an insurance contract are construed against the drafter and in favor of the insured. Paul Revere Life Ins. Co. v. Prince, 375 So. 2d 417, 418 (Miss. 1979); Centennial Ins. Co. v. Ryder Truck Rental, Inc., 149 F.3d 378, 382-83 (5th Cir. 1998). Likewise, the terms contained in an insurance policy, specifically exclusion clauses, are construed against the insurer and in favor of coverage. State Farm Mut. Auto Ins. Co. v. Scitzs, 395 So. 2d 1371, 1373 (Miss. 1981). When an insurance policy has two equally reasonable interpretations, the court construing the policy must adopt the interpretation giving greater indemnity to the insured. Caldwell v. Hartford Accident & Indem. Co., 248 So. 2d 209, 213 (Miss. 1964).

The Intervenor Federal Insurance Company (Federal) indisputedly received a timely claim for indemnity from the Defendant Superior under the primary policy, which provides $1,000,000 in coverage for any one occurrence. In addition, it is undisputed that both the Defendant Superior and Collins Brent, individually, are Assureds under the primary policy.

Under the primary policy's Ship Repairer's Liability section (Section II of the Marine General Liability Policy), the court finds that Federal is obligated to indemnify Superior for the damages awarded against it in favor of the Plaintiff in this case. Section II of the policy provides:

> The Company agrees to pay on behalf of the Assured all sums which the Assured, as Ship Repairer, shall become legally obligated to pay:
>
> A. By reason of the liabilities imposed upon the Assured by law for physical loss of or damage to watercraft and their equipment, cargo

> or other interests on board occurring only while such watercraft are in the care, custody or control of the Assured for the purpose of repair or alteration, or while such watercraft are being moved via inland waters, in connection with repairs or alteration ...

The court finds that, under the plain language of this section, Federal is obligated to indemnify the Defendant for the damages being awarded to the Plaintiff in this case. The SPLASH casino barge was damaged and lost while it was in the care, custody or control of the Defendant, as Ship Repairer, for the purpose of repair or alteration; indeed, it was undisputed at trial that the purpose for the SPLASH barge being moved to Lake Ferguson was so that it could be refurbished and repaired in order for it to be returned to active service as a casino barge. It was also undisputed at trial that the Plaintiff and the Defendant entered into an oral contract for the Defendant to provide repair and alteration services to the SPLASH barge. In addition, the Defendant had already assisted in some repair work on the SPLASH by supplying tug and crane services in connection with the repair work that was accomplished prior to the SPLASH's capsizing. The Defendant ultimately was unable to provide the external metal work it had contracted to perform because the SPLASH capsized before the work was scheduled to be performed. This occurrence does not change the fact that the Plaintiff contracted with the Defendant for repair services or that the reason the SPLASH was moored at the Defendant's facility was for repair or alteration.

The fact that each and every repair that was scheduled to be completed on the SPLASH barge was not to be solely performed by the Defendant at best creates an ambiguity in the contract's language as to whether or not the SPLASH was in the care, custody or control of the Defendant, "as Ship Repairer," for "the purpose of repair or alteration;" and, as noted above, under Mississippi law any ambiguities in an insurance contract are construed against the drafter and in favor of the insured.

Paul Revere Life Ins. Co., 375 So. 2d at 418; Centennial Ins. Co., 149 F.3d at 382-83. Thus, the court finds that indemnity coverage for the subject allision and sinking of the SPLASH casino exists under the primary policy's Ship Repairer's Liability section (Section II of the Marine General Liability Policy). That section of the policy does not explicitly impose the limitation now sought by Federal - i.e. that coverage be limited to situations in which the Assured itself is conducting repairs or alterations to watercraft under its care, custody or control. Federal could have explicitly provided such a limitation but did not do so under the plain language of the policy.

As for coverage exclusions under Section II of the primary policy, Federal argues that Exclusion G under the primary policy's Ship Repairer's Liability section excludes coverage for the subject occurrence. Exclusion G provides:

> This section (Section II) does not cover against nor shall any liability attach hereunder for:
>
> G. Loss of or damage to watercraft placed in the care, custody or control of the Assured for the purpose of storage regardless of whether any work is to be performed on the watercraft; ...

Here, the undisputed trial testimony was that the SPLASH casino barge was not moored at the Defendant's facility for the "purpose of storage," but rather for the purpose of repair or alteration and refurbishing. The SPLASH had been stored for nearly eight years at Port Allen, Louisiana, before it was moved to the Defendant's Lake Ferguson facility in June of 2004 in order to be repaired and refurbished so it could be returned to service as a casino barge. No witnesses testified at trial that the SPLASH barge was placed in the Defendant's care, custody or control for the purpose of storage; indeed, the opposite is true. Thus, the court finds that Exclusion G does not apply and does not exclude coverage for the subject occurrence.

Because the court finds that the primary policy provides coverage, and that no exclusions apply to exclude coverage under that policy, the court finds that Policy No. 7319777 (the Marine General Liability/Ship Repairer's Legal Liability Policy) requires Federal to indemnify the Defendant Superior and Collins Brent for this occurrence (the capsizing of the SPLASH casino barge), including legal fees reasonably incurred in the defense of the Plaintiff's claims.

*C. Conclusion*

In sum, the court finds that the Defendant Superior is 75 percent liable for the subject allision and the subsequent capsizing of the SPLASH casino barge and the Plaintiff Schilling is 25 percent liable. Because the Defendant Superior has been dissolved as a corporation, and Mr. Collins Brent has continued to do business as Superior Boat Works, it is undisputed that Mr. Brent is personally liable for Superior's debts, including this judgment. Carolina Transformer Co. v. Anderson, 341 So. 2d 1327, 1329 (Miss. 1997). Thus, the court shall enter judgment against both Superior Boat Works and Collins Brent, individually. As for the Intervenor Federal's complaint, the court finds that indemnity coverage for this occurrence is provided by Policy No. 7319777 (the Marine General Liability/Ship Repairer's Legal Liability Policy).

Finally, the general rule in admiralty is that prejudgment interest should be awarded absent peculiar circumstances. City of Milwaukee v. Cement Div., Nat. Gypsum Co., 515 U.S. 189, 195-96, 115 S.Ct. 2091, 2095-96, 132 L. Ed. 2d 148 (1995); King Fisher Marine, 724 F.2d at 1187. The rate of prejudgment interest to be awarded is within the court's discretion. Zim Israel Navigation Co., Ltd. v. Special Carriers, Inc., 800 F.2d 1392, 1395 (5th Cir. 1986). Because no peculiar circumstances exist here, the court finds that an award of prejudgment interest is proper. Prejudgment interest shall be awarded to the Plaintiff at the rate of six percent per annum from the

date of the capsizing, September 11, 2004, to and including the date of this opinion.

A separate judgment in accordance with this opinion shall issue this day.

This the 31st day of August 2006.

/s/ Glen H. Davidson
Chief Judge